UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  6:16-MJ-0063-MJS |
| Plaintiff, | |
| v. | **STATEMENT OF DECISION** |
| KENNETH S. MCADAMS | |
| Defendant. | |

## I.    Procedural Background

On July 23, 2016, Defendant Kenneth McAdams was arrested in Yosemite National Park for driving under the influence of alcohol, driving with a breath or blood alcohol concentration above 0.08%, and failure to obey a traffic control device.   On August 16, 2016, the Government filed a criminal complaint, charging those three violations, and on August 30, 2016, Defendant entered a plea of not guilty to all three counts.   A Motion to Suppress Evidence was filed by Defendant, and an evidentiary hearing thereon was held on January 31, 2017.   Following this Court's denial of that motion, the matter was set for trial on October 6, 2017.   Due to scheduling conflicts, the trial date was continued to December 6, 2017.   At the trial, the Government called four witnesses:    Matt Thomas, Ranger Jesse McGahey, Ranger Jason Montoya and Criminalist Jessica Winn. The Defense called one witness: Criminalist Stanley Dorrance.

At the conclusion of the trial, the Court ordered the parties to submit summaries of witness testimony and evidence.   The parties jointly submitted the following Summary.

## II.   Summary of Witness Testimony[1]

### A. Government Witness Matt Mr. Thomas - appearing via video from the U.S. District Court in Santa Ana, California.

#### 1.  Background

Mr. Thomas testified he currently lives in Whitier where he is employed as a server and bartender at a private club.   He was previously employed in Yosemite National Park from 2010 to 2016, in Yosemite valley for 5 years, and the Wawona Hotel/Big Tree Lodge for two years:  from 2010–2012 he worked at Curry Village as a team lead, from 2012–2015 he worked at the Yosemite Lodge as a server and bartender, and in 2015–November, 2016  he worked at the Wawona Hotel as the dining room manager and food and beverage manager.

#### 2.  Training and Experience

Mr. Thomas testified he was a server and bartender in the Yosemite Lodge Mountain Room for 3 years, and to hold that position he had the Training for Intervention Procedures (TIPS) as well as on the job training through management staff on how to identify people who may have been too intoxicate to serve.   Mr. Thomas described the TIPS training as a program that teaches how alcohol effects the body, the comparisons between beer, wine, liquor, how much a person can be served before they become over intoxicated, and ways to prevent that.   He acknowledged the course also covered what to do if someone in his bar was intoxicated.

Mr. Thomas testified that in the course of his career he at times has not served people because they were too intoxicated.   To determine if someone is too intoxicate he looks for slurred speech, irritated eyes, glazed eyes, loud boisterous behavior, and ability to stand straight.   He acknowledged that in the course of his career he had observed

---

[1] This Section II of the Statement of Decision republishes verbatim the summary of trial testimony jointly presented by the parties, in its entirety and without correction for grammatical or typographical errors or other editing.  The Court finds it accurately reflects the testimony presented at trial.

drunk people and observed drunk people walking over 100 times, and he further agreed he would use walking behavior as a factor in deciding if a person is too intoxicate to continue being served.

On cross examination, Mr. Thomas stated that he was trained on how to identify intoxicated individuals, and one such indicator is struggling to walk.  But Mr. Thomas acknowledged that people have disabilities and there might be other reasons (other than intoxication) why someone is struggling to walk.  He acknowledged that without knowing their drinking pattern he might be more hesitant to refuse to serve someone who exhibited difficulty walking.

### 3. Initial observation of Defendant and his group on July 23, 2016

Mr. Thomas testified he was working in Wawona on July 23, 2016, and around 2:30 pm, he alerted the front desk to a potential situation with some guests, a party of three, sitting on the veranda of the hotel who were drinking their own alcohol.  He recalled they were drinking wine.  The group consisted of 2 females and one male all approximately 25-30 years old.  Mr. Thomas described both women as brunette.  Mr. Thomas described the male as 250-280 lbs, under 6 feet tall and under 30 years old.  He recalled the Defendant having a European accent and sounded as though he was from Russia or Romania.  He described Mr. McAdams as wearing pants, a shirt and a jacket.

On cross examination, Mr. Thomas acknowledged that while he testified on direct he saw Mr. McAdams drinking on the veranda, this was not included in his witness statement.  Nonetheless, Mr. Thomas was adamantly that he had seen Mr. McAdams on the veranda.  He remembers him and his friends because they were in an area that the hotel was not servicing and they were drinking their own alcohol. Mr. Thomas stated that McAdams and his friends were not guests at the hotel, and Mr. Thomas had not served Mr. McAdams any alcohol.  Rather, Mr. McAdams and his friends had brought their own alcohol—wine specifically.

### 4.  Identification of Defendant

At the Government's request the courtroom video was manipulated to get a closer view of the Defendant on the video, and Mr. Thomas identified the Defendant as the person he saw in Wawona on July 23, 2017.  He said he got within 5 feet of the Defendant when they spoke, and he was confident he was identifying the same person.

### 5.  Description of events and interaction with Defendant

Mr. Thomas testified the group did not remain on the veranda.  It was when they were leaving the veranda that they got his attention.  He observed them going down the steps off the veranda to the parking lot.  Mr. Thomas stated there are about 7 steps and he notices they were going down the steps shoulder to shoulder with each other.  He described that from the entrance of the hotel to their parked car was about 200 feet, and Mr. Thomas and the other employee watched them walk with each other "shoulder to shoulder" holding on to each other while walking to their car.  While Mr. Thomas was watching them, one of the females dropped something and was stumbling as she bent down to pick it up.  The other two people, the other female and the defendant walked toward the car holding on to each other for support.  Mr. Thomas stated he followed them to make sure they didn't drive.  He walked behind them about 15 feet the entire time walking through the parking lot, watching them to whole time.  Mr. Thomas testified he saw all members of the group, including the defendant, stumbling and walking while supporting each other.  Mr. Thomas testified as the Defendant was getting into his car, Mr. Thomas stopped him and introduced himself and asked if the Defendant was safe to drive.  The Defendant said something to the effect of "don't worry about us."  Mr. Thomas stated when he spoke with the Defendant he observed his eyes were a little drowsy.  Mr. Thomas stated he observed the Defendant get into the driver's seat and one of the females also get into the driver's seat with the Defendant.  Mr. Thomas further observed the Defendant back up from his parking space, and in the process almost sideswipe the car parked next to him, and the honk at the parked car.  He stated he did not see the Defendant or the female who got into the driver's seat with him move before

the car started to drive away.   Mr. Thomas stated he observed the Defendant leave the hotel parking lot and go North on Highway 41 before he went in to call the rangers.

On cross examination, Mr. Thomas reiterated he witnessed Mr. McAdams walk to his car, and that Mr. McAdams and one of his female friend had their arms around each other.   Mr. Thomas then spoke with Mr. McAdams, during which Mr. McAdams was coherent and informed Mr. Thomas that he did not need his assistance.

Next, Mr. Thomas observed McAdams back out of his parking spot, and get within inches of another car.  Mr. Thomas said that McAdams had ample space to turn around, although the hotel was at full occupancy.  Mr. Thomas acknowledge that although on direct he testified McAdams honked at the parked car, it could have been the friend who was on Mr. McAdams's lap as they were drove out of the parking lot and down the highway.

### 6.  Actions after Defendant left in vehicle

Mr. Thomas stated he then took down the make and model of the vehicle and he went back to the hotel and asked one of the front desk clerks to call the rangers.

Mr. Thomas stated he thought the Defendant's car might have been a BMW.  The Government read a portion of Mr. Thomas's witness statement written on July 23, 2016 in which he stated the car driven by the Defendant was a Mercedes.   Mr. Thomas agreed it might have been, and he recalled it was a European model.

### 7.  Interaction with rangers

Mr. Thomas testified when he returned to the hotel he asked one of the front desk clerks to call the rangers.  He provided a written statement to the rangers at their request when they came to the Wawona Hotel later the same day to question him about the incident.

On cross examination,  Mr. Thomas acknowledged that while he testified on direct he saw Mr. McAdams drinking on the veranda, this was not included in his witness statement.  To explain the discrepancy in his witness statement, Mr. Thomas explained that in the statement he focused more on his observations of Mr. McAdams and his

1    friends walking to the car.  While he thinks it is important to provide many details, he did

2    not give a detailed statement because Mr. McAdams was already arrested and the

3    rangers had stopped him at work when he was very busy.

### 8.  Opinion on Defendant's intoxication

5    Mr. Thomas testified that based on what he observed about the Defendant in the

6    hotel, what he observed as he walked to the car, and what he observed when he spoke

7    to the Defendant, his opinion was the Defendant was intoxicated and if he had seen him

8    in a bar when he was bartending or serving, he would have been concerned about

9    continuing to serve him.  Mr. Thomas stated he was concerned about letting him drive.

### B.  Government Witness Ranger Jesse McGahey

### 1.  Training and experience

12   Ranger McGahey testified he has been employed in Yosemite Valley as law

13   enforcement ranger since 2015, and has been a law enforcement ranger seasonally

14   since 2007 with the National Park Service. His training included a seasonal academy

15   and completion of the Federal Law Enforcement Training Center (FLETC) program in

16   Glenco, GA.

### 2.  Description of traffic pattern in Yosemite Valley on July 23, 2016

19   Ranger McGahey testified the traffic pattern at that time from Bridevel Straight to

20   Sentinel Creek was such that the right lane was a bus lane and the left lane was for

21   visitor traffic.  The bus lane was open to busses, administrative traffic and emergency

22   traffic.  Between Bridelviel Straight and El Cap Cross there were signs indicating the

23   traffic lane restriction including two variable boards, one at Bridelvel and one at El Cap

24   Cross.  There were eight other permanent signs in place and switched to designate the

25   right lane as a bus lane.

26   He is very familiar with roads in Yosemite Valley and the surrounding districts,

27   and confirmed that to get from Wawana to his location, a person would have to drive

28   past the Bridelviel area. At approximately 4:00 pm traffic in the visitor, left lane, was

backed up to El Cap Cross or further and traffic was moving at stop and go pace with a maximum speed of 0 MPH.  The bus lane was free and clear and traffic could move at 25-30 MPH.

On cross examination, Ranger McGahey agreed that passenger cars are often in the bus lane in Yosemite, so much so that Ranger McGahey was sent out to direct traffic into the left lane, and in fact the park rangers have a soft policy to issue a warning for the initial violation.

### 3.  Initial observation of and interaction with Defendant

He was on duty on July 23, 2016 and at approximately 4:00 P.M., he was on bike patrol on Southside Drive between El Cap Cross and Sentinel Creek performing traffic control and maintaining the bus lane traffic restrictions.  At that time he was facing west with traffic coming at him from west to east.  His location was East of Two Trees and West of Sentinel Creek about 1/2-3/4 mile East of El Cap Cross.  At approximately 4:00 pm, he observed a blue Mercedes sedan traveling in the bus lane.  He indicated for it to move over into the personal vehicle lane and the driver complied with his instructions and moved.  As the blue Mercedes slowly moved past him, he observed the occupants. He recalled one of the passengers had pinkish/red brightly colored hair.  He did not see the license plate of the vehicle and he did not get clear look at the driver at that time.  On re-direct, Ranger McGahey confirmed the blue Mercedes was not a bus.

On cross examination, Ranger McGahey stated when Mr. McAdams was found in the bus lane, he complied with Ranger McGahey's order to move into the lane of traffic. He complied without incident; he did not swerve, or weave, or drift onto the shoulder.

### 4.  Second interaction with Defendant

He saw the same vehicle again that day, 3-5 minutes later.  After hearing on the radio that Ranger Montoya had performed a vehicle stop of the vehicle with the same description, he responded to Ranger Montoya's location approximately 1/4 mile east of

him by bike and he observed it was the same vehicle. When he arrived at the scene the driver was still in the vehicle.

On cross-examination, Ranger McGahey stated he had witnessed Mr. McAdams driving in the right lane, the bus lane.  Ranger McGahey reported to the scene of the DUI investigation.  He approached from the passenger side and could see in plain view several beer cans in Mr. McAdams's car.  He asked the passenger to hand him the empty beer cans.  There was a trace amount of alcohol in the beer cans, but almost all of the beer had been consumed.  The empty beer cans were found in the front passenger seat, but there was also an empty box of the same type of beer in the back seat.

Ranger McGahey said he observed Ranger Montoya conduct the HGN and saw part of the walk and turn.  During the HGN test, Ranger McGahey could only see Mr. McAdams's right eye, which exhibited nystagmus.  Ranger McGahey is aware that there are other causes of nystagmus but he could not tell the court what they are, as he is only trained on how to recognize nystagmus from consumption of alcohol.  However, he agreed that nystagmus from alcohol and from other sources would be indistinguishable. Ranger McGahey stated that based on Mr. McAdams's appearance and his performance on the HGN test, he thought it likely that Mr. McAdams would be found to be intoxicated.

Ranger McGahey reached this opinion because of his observations, which were included in his original report.  Ranger McGahey wrote in his original report that Mr. McAdams had red eyes, was slurring his words, and was speaking very slowly.  Defense counsel played a clip of Ranger McGahey's body camera, which showed Mr. McAdams speaking quickly.  When asked about the discrepancy between Ranger McGahey's observations and the video camera, Ranger McGahey stated that the video has one point of view and he has another.

### 5.    Identification of Defendant

During his testimony Ranger McGahey identified the driver of the Mercedes as the Defendant in the courtroom.

### 6.    Reports

On cross examination, Ranger McGahey admitted that in his original report, he erroneously described the left lane as the bus lane.  About five months later, he filed a supplemental report in which he corrected that error.  His testimony was based on these reports.

## C.    Government witness, Ranger Jason Montoya

### 1.    Training

Ranger Montoya testified he is employed at Yosemite in Yosemite Valley as a Supervisory Law Enforcement Park Ranger.  He has been a law enforcement ranger since 2007, and a supervisor for 1 year.  His training included a seasonal academy, and completion of the FLECT program in 2009.  He had specific training in DUI investigation in both seasonal academy and FLETC.   The training included identifying vehicles, preforming investigations, conducting  standard field sobriety tests (FSTs), and the training at FLETC was conducted in accordance with National Highway Traffic Safety Administration (NHTSA) standards [Government Exhibit 3]

Ranger Montoya testified in the DUI training he had received, he was trained to look for odor of alcohol, physical appearance, bloodshot eyes, slurred speech, and reaction to divided attention questions.

Ranger Montoya testified he was trained to administer field sobriety tests, which are tests looking into an individuals ability to safely operate a vehicle.  These tests include, Horizontal Gaze Nystagmus (HGN), Walk and Turn, and One Leg Stand.  The Walk and Turn and One Leg Stand test for balance and coordination.

Ranger Montoya testified he had received training in HGN, had received training in both the seasonal academy and FLETC, and part of this training included the effect of

alcohol consumption on HGN.  Alcohol consumption has correlation on presence of HGN.  Ranger Montoya has conducted HGN test in field on subjects 50-100 times and trained others in SFST as a field-training ranger and instructor at Santa Rosa Junior College.  In the course of serving as a trainer and on the job, he has conducted HGN test 100-200 times in career.   Also in the course of his career, he participated in 5-10 DUI investigations per year which resulted in 3-5- arrest per year for DUI.

Ranger Montoya testified he was trained on the Drager Alcotest 7510 in 2013, received a certificate of training, and has used the instrument 5-10 times per year since then.

On cross examination, Ranger Montoya testified he received his training from the Federal Law Enforcement Training Center about seven years ago (2009).  The training covered how to recognize signs of impairment.

Ranger Montoya was separately trained on how to administer the breath test. This training was either a half or full day course which Ranger Montoya completed in July 2013.  At the training, California DOJ came and instructed on how to administer the breath test, including how to utilize the device to obtain evidentiary samples.  To become certified to administer breath tests, Ranger Montoya had to correctly administer the test with a partner.

Ranger Montoya was also trained on how to administer the field sobriety tests and was given an opportunity to practice before being tested for certification.   Ranger Montoya studied for those test.

## 2.   Description of traffic pattern

The left lane was a passenger lane and right lane was bus lane.  He recalled there were about 8 signs indicating the lane restrictions.  Ranger Montoya testified he was very familiar with the roads in Yosemite National Park, and from the Wawana Hotel to his location at that time was approximately 25-20 miles.  He further stated he was familiar with ebbs and flows of traffic pattern, and on July 23, 2016, he would estimate it

would take 1-1.5 hours to get from the Wawana Hotel to his location. Traffic in the left lane was moving at stop and go.

On cross examination, Ranger Montoya discussed the reason he initially stopped Mr. McAdams; he pulled McAdams over for driving in the right lane, which was designated as a bus lane. While Ranger Montoya could not confirm the number of signs that Mr. McAdams had passed that designated the right lane as a bus lane, Ranger Montoya described the signs as fixed, rotating post signs about one foot by two feet in size.

### 3.    Initial contact with Defendant

Ranger Montoya testified in July 2016 he was assigned to Yosemite Valley, and on July 23, 2016 at approximately 4:00 PM he was on Southside Drive west of the 4 Mile Trailhead. He was on bike patrol, in part to maintain the bus lane, and at that time he was heading against traffic in the right lane. Ranger Montoya testified that at approximately 4:05PM he observed a blue Mercedes in the bus lane of traffic coming towards his location. There were no other cars between him and the blue Mercedes in the bus lane, so he had an unobstructed view of vehicle, and it was 15-20 car lengths from him. He observed it move from the right bus lane into the left passenger car lane. Ranger Montoya stated he continued to observe the vehicle until it got to his location. He did not lose sight of the vehicle in the 30-60 second it took to reach his location. When the vehicle reached his location, he indicated for it to pull over into the bus lane to preform vehicle stop. He had no doubt the vehicle he saw in the bus lane was the same vehicle he stopped.

Ranger Montoya testified that after stopping the vehicle, he contacted the driver, got his identification, and ran the plates through Yosemite dispatch. He was standing at the rear of vehicle when ran registration, and when he reproached Defendant he asked him why he was in bus lane and Defendant stated it was passing lane. Ranger Montoya

noted there were 3 people in vehicle, the driver plus 2 passengers.   One of the passengers stated other cars were driving in the bus lane also.

Ranger Montoya testified he received information from Dispatch that the vehicle matched a BOLO advisement from earlier in day in Wawona.   He acknowledged he did not have that information when he first stopped vehicle.   When he recontacted the Defendant he wanted to check to see if he matched the report and to conduct a DUI investigation

On cross examination, Ranger Montoya stated when he saw Mr. McAdams driving, he did not notice any swerving, weaving, or drifting.  Rather, Ranger Montoya observed Mr. McAdams move back into the lane of traffic.  When Ranger Montoya ordered Mr. McAdams to pull off to the side, Mr. McAdams had no issue complying with the command.

Ranger Montoya approached the vehicle and noticed a Modelo case in the backseat.   He then asked Mr. McAdams for his driver's license, registration and insurance, which Mr. McAdams handed over without incident.

### 4.   Observation on field sobriety tests

The Defense Counsel raised an objection to the line of questioning as it called for expert testimony.  The Government acknowledges Ranger Montoya was not designated as an expert, but stated the belief he did not need to be qualified as such for to give testimony on DUI investigation.  The Court allowed questioning to proceed.

Ranger Montoya testified that during their initial contact on July 23, 2017, the Defendant said he was coming from San Francisco and he had not been drinking. Ranger Montoya stated that during that conversation he observed the smell of alcohol from the passenger compartment of the vehicle, and that the Defendant had sluggish watery eyes, slurred speech, and gave inconsistent answers to his questions.  Ranger Montoya stated he asked the defendant to step out of the vehicle, and he asked a series of standard questions to ascertain any possible medical conditions and complete a DUI

investigation.   Ranger Montoya stated during that questioning, the Defendant stated there was nothing wrong with his vehicle, he did not have any injuries, did not need a doctor, was not on any medication, there was nothing wrong his with eyesight, the last time he slept was the night prior, the last time he had eaten was the night prior when he had a sandwich, and he has last consumed alcohol the light prior when he had one beer in San Jose.   Ranger Montoya testified he observed the defendant look at his watch when he was asked when he last ate, and he stated it was 3:10 when it was in fact 4:10.

Ranger Montoya testified he asked the Defendant to perform FST at the rear of the vehicle on a level asphalt surface.

Ranger Montoya testified that before the balance tests the Defendant requested to put on shoes, and he changed into athletic shoes.   The test was done on the same roadway surface.   Ranger Montoya placed the Defendant in the position for the instruction phase which was left foot on line and right foot in front, hands down at side. He then explained to the Defendant to hold that position as the test was explained and demonstrated and not to starts until he was told to start.   Ranger Montoya stated he observed the Defendant lost his balance exiting the position and he asked to start prior to being told he could.   Ranger Montoya had to repeat directions multiple times.   He stated the ability to follow instructions is one of the things looked for in the tests

Ranger Montoya testified that on the Walk and Turn Test he observed on 1st set of 9 the Defendant missed heel to toe on steps 3-4 and 8-9 and he stepped off the line on the 9th step of the 2nd steps of 9. On the One Leg Stand Test the Defendant raised his arm more than 6 inches, and he counted to 23 second when 30 seconds time had elapsed.

On cross examination, When Ranger Montoya tested Mr. McAdams on the field sobriety tests, Mr. McAdams was not given any time to practice nor was he given a second chance if he did not pass.

The field sobriety tests have several instructions.  Part of Ranger Montoya's job is to make sure that the subject understands all of the instructions before beginning the test.  Ranger Montoya stated on direct that he had to repeat himself several times.  But Ranger Montoya admitted that people sometimes tell him that he is soft spoken and occasionally tell him he is difficult to hear.  Furthermore, on the day of the arrest, there was heavy traffic.

When people take this test, Ranger Montoya stated that they are sometimes nervous, because their failure could potentially result in their arrest.  In fact, even a sober person might feel nervous if they are taking a test that could land them in jail.

Ranger Montoya stated that Mr. McAdams was having a hard time standing during the walk and turn, but admitted that Mr. McAdams was neither holding onto anything for balance nor was he swaying.  (1:43:33).

Defense counsel played video footage from Ranger Montoya's body camera of the walk and turn.  Ranger Montoya agreed that McAdams took nine steps, turned around, and took another nine steps back.  He acknowledged that Mr. McAdams was paying attention and was responsive.   Mr. McAdams confirmed each of the nine instructions and Ranger Montoya repeated himself several times.

In his report, Ranger Montoya had noted that Mr. McAdams missed heel to toe by half an inch twice—an eyeball estimation that Ranger Montoya made without a ruler.  Ranger Montoya acknowledged that standing heel to toe is not a typical stance, not one that a person would normally stand in.

In his report, Ranger Montoya stated that during the one legged stand, Mr. McAdams counted to 23 during a 30-second period.  However, Ranger Montoya had not instructed Mr. McAdams to count to 30 seconds, and Mr. McAdams had stopped half way through to check whether he should keep going.  The report also noted that Mr. McAdams raised his arm higher than 6 inches—another eyeball estimation.

14

After watching the video, Ranger Montoya agreed that Mr. McAdams pointed his toe and did not fall during the one legged stand.

### 5.      Horizontal Gaze Nystagmus Test

Defense counsel renewed her objection to testimony as Ranger Montoya was not designated as expert.  The Government suggested *U.S. v. Nguyen* 75 Fed R Evid Serv. 1018 2008 WL 540230, holds that an officer is able to testify to HGN without being designated as expert.  The Court allowed testimony to go forward, however, the Court advised he would only consider testimony from Ranger Montoya regarding the effects of alcohol on the ability to perform field sobriety tests after reviewing the case law and making a determination.

*Ranger Montoya provided the following testimony regarding HGN.  The parties agree Ranger Montoya was not qualified as an expert, and the admission of this testimony is the subject of the Defense supplemental briefing regarding expert testimony.*

### a.      Procedure of test

Ranger Montoya stated HGN is the first test in FST series.  He testified the standard procedure is to have a person stand with his hands at his side, to ask him standard questions about his eyesight or glasses, to preform the test using stimulus such as a pen, pen light, or finger which is placed 12-15 inches from a person's face and a series of passes are made and the subject is asked to watch the stimulus with his eyes.

On cross examination, Defense Counsel played body camera video footage, which showed Ranger Montoya administered the breath test five separate times. Ranger Montoya explained that he kept re-administering the test because he got an error reading each time.

### b.      Test of Defendant

The first test was HGN, during which Ranger Montoya observed the lack of smooth pursuit in both eyes, distinct and sustained Nystagmus at maximum deviation in

both eyes and on set prior to 45 degrees in both eyes, as well as vertical nystagmus in both eyes.   Ranger Montoya stated these results indicated an individual may be impaired, and based on his training and experience he knew alcohol can cause exaggerate nystagmus, and what he was observing was exaggerated nystagmus.

*As noted previously, the admission of this testimony regarding HGN is the subject of the Defense supplemental briefing regarding expert testimony.*

### 6.      Ranger Montoya preliminary determination

Ranger Montoya testified that based on the Defendant's physical appearance, the HGN test, and his observations of the FST, he formed the opinion that the Defendant was intoxicated to a point that he was unable to safely operate a vehicle.

### 7.      Preliminary breath test

Ranger Montoya testified he then requested the Defendant take a preliminary breath test which confirmed the presence of alcohol.   Ranger Montoya testified the Defendant was out of his car during FSTS for approximately 10-15 minutes, and during that time he did not eat, drink, or chew during that time, and Ranger Montoya would have observed the Defendant if he had put something in his mouth.

### 8.      Arrest, search, and transport of Defendant

Based on the results of the FSTs, the Defendant's physical appearance, and the preliminary breath test, Ranger Montoya stated he formed the opinion that the Defendant was under the influence of alcohol, and he arrested the Defendant for the traffic control device violation, driving under influence of alcohol to a degree that he was a danger to self and others, and driving under the influence of alcohol.  He searched the Defendant and found no food, alcohol, gum, or anything that could be chewed on his person.

Ranger Montoya testified the Defendant did not get back in his car between the FST and his arrest, and he was not out of ranger's sight during that time. The rangers did not see him put anything in his mouth or drink anything.

16

Ranger Montoya testified after being placed under arrest the Defendant was place in handcuffs behind his back.  He further stated it was not likely for a person to get his hands to his mouth when in handcuffs behind his back.   The Defendant was then transported to the Yosemite Holding Facility.  Ranger Montoya was not certain if he had transported the Defendant himself.  He stated in his experience it is common to transport people in handcuffs.

### 9.    Initial procedure at Yosemite Holding Facility

Ranger Montoya testified that after arrival at the Holding Facility he requested information on the Defendant's license from dispatch, and the return on that request listed the Defendant weight at 150lbs.  At holding facility defendant was searched again. Ranger Montoya stated he did not perform the search, but he was present, and the Defendant did not have any food, drinks, alcohol, gum, or anything that could be chewed on his person.  After being searched the Defendant was put into the booking cell which is a small cell about 8ft x6ft with wire mesh and a small bench in corner.  Ranger Montoya stated rangers can see into booking cell.

Ranger Montoya testified there is a close circuit tv in the Holding Facility that was recording at the time the Defendant was search and during the booking process, and that he had viewed the video from the Holding Facility since incident.

### 10.    Evidentiary Portable Alcohol Screening Test

Ranger Montoya testified there is an evidentiary breath test machine in the Holding Facility, a Drager Alcotest 7510 evidentiary breath test.

#### *a.    procedure of test*

Ranger Montoya described the procedure for operating the instrument as: open the case, turn the power on, use the operators swipe card confirmation and enter operator passcode, enter the test subject information which in California is a swipe of the subject's driver's license, confirm the 15 minute deprivation period occurred.  Once those

steps are completed, the instrument allows testing to begin.  Ranger Montoya stated you know the instrument is working properly if it allows you to take sample.

Ranger Montoya testified the instrument provides a printout, like a receipt which comes from a printer inside the case.  The Government introduced Government Exhibit 8 also previously marked as Defense Exhibit D; a copy of the printout.  Ranger Montoya testified the exhibit was a copy of the printout he received, and it showed the name Kenneth McAdams.  He explained the "air blank" is something the instrument does to clear itself and to ensure there is no alcohol in air. An air blank reading of 0 indicates the instrument is working properly.  After the air blank was done, Ranger Montoya stated he had defendant take the test.  This is done with instruction from the instrument: after entering in all the information, the instrument tells you to remove from the mouth piece from the cradle, after that is done and a new mouthpiece is inserted, the instrument says blow on the front of it.

### b.    observation period

Ranger Montoya testified his training included the observation period requirement of a minimum of 15 minutes before the breath test.  He stated that from the time he asked the Defendant to get out of car at stop to the time of the breath test at the Holding Facility 1.5 hours had lapsed.  During that time Ranger Montoya did not observe the defendant eat, drinking, or chew anything, and the only time the Defendant was out of Ranger Montoya's eyesight was when he was transported, but at that time he would have been with another officer.  Ranger Montoya testified during the time the Defendant was with him he did not drink any alcoholic beverage, and the Defendant did not vomit during that time.

The Government played a portion of Government Exhibit 2- booking facility video 1 from time 17:22:56 to 17:23:57 as shown on the upper left hand corner of the video.

Ranger Montoya described the video clip as part of the deprivation period at the Holding Facility.  He described on the video, Ranger Wentz had completed fingerprinting

18

and left the room. Ranger Montoya was completing paperwork regarding the tow of the vehicle, and he exited the room and went into the hallway directly adjacent to the booking room and asked Ranger McGahey to complete the processing of the vehicle and finishing the paperwork.  Ranger Montoya testified he had started the deprivation period on his watch and at the time played on the video clip he was in the middle of deprivation period.  Deprivation period and observation period are the same period, and he was trained to do a 15 minutes prior to the breath test.

The government played the same video segment again, and Ranger Montoya testified he could hear his voice on video during that period.

The Government played another segment of the same video, time 17:23:57 to 17:24:34.  Ranger Montoya described that segment as being at the period at the Holding Facility when he was talking with Ranger McGahey in the hallway and then opening the back door of the jail for Ranger McGahey to exit.  Ranger Montoya then returned to the booking room.

Ranger Montoya testified that when he returned to the booking room he could see into the booking cell.  He stated Ranger Wentz didn't say anything to him about the defendants behavior, and it would, in his experience, be typical for other ranger to tell him if the suspect did something unusual.   Ranger Montoya did not observe any vomit in the booking cell or on the Defendant.

On cross examination, Ranger Montoya confirmed Mr. McAdams had been searched before entering the holding facility, so there was no alcohol or food on him. But there is no way to test whether Mr. McAdams had burped or regurgitated in his mouth during the 15 minutes prior to the test.

Ranger Montoya did not directly observe Mr. McAdams for the full fifteen minutes prior to administering the test, however he was in the door way to the booking room, facing out of the room.  For the time that Ranger Montoya was inside the booking room,

he was engaged in several tasks: filling out paper work, taking drinks of water, and talking to the other officers.

Ranger Montoya indicated in both his arrest report and the breathalyzer print-out that the 15 minute observation period had been completed prior to administering the test.

### c.     EPAS instrument set up

Ranger Montoya testified he administered breath test on the Alcotest 7510 which is not a Park Service instrument but was provided by California Department of Justice. To ensure the instrument was working properly the rangers do calibration checks on the instrument as well as periodic downloads of information from the instrument to the Department of Justice.   To ensure it is working properly, Ranger Montoya stated, he uses the instrument according to the training he received.   Ranger Montoya stated he followed his training on July 23, 2016, and the instrument was working properly.   He did not receive any codes or readings to indicate the instrument was not working properly. Additionally, he had used the instrument multiple times prior to July 23, 2016 and it functioned the same that night as on prior occasions, and based on his training, knowledge of instrument and proper operations of instrument, it was working properly.

On cross examination, Ranger Montoya stated after the DUI investigation, Mr. McAdams was transported to the holding facility where Ranger Montoya administered the evidentiary breath test (AlcoTest 7510).  Ranger Montoya had to open and close the machine several times before the machine finally turned on.

When administering the breath test, Ranger Montoya generally tells the subject to take a deep breath and to blow at a steady flow to give an adequate sample to test.  The administrator of the test is also supposed to observe the individual for 15 minutes prior to administering the test.  This is to make sure the subject does not eat, drink, burp, vomit, or regurgitate, because this can affect the oral cavity.

#### d.      Defendant initial test attempt

The Government played a segment from Government Exhibit 3, Holding Facility Video booking video 2, from minute 17:34:58 to 17:36:32.

Ranger Montoya described that segment as showing Ranger Montoya having the Defendant attempt to give the first breath sample.  The Defendant didn't give enough breath volume, and the instrument requires a certain volumes and flow rate.  Ranger Montoya stated the instrument gave a reading of either insufficient volume or interruption of flow, and no sample was taken.   This did not indicate a problem with the machine, but was how the Defendant was providing a sample. Ranger Montoya stated this message indicated the instrument was working properly.

#### e.      Defendant first evidentiary test

The Government continued the same video from time 17:36:32 to 17:37:03. Ranger Montoya testified the video showed the Defendant gave a breath sample adequate for reading, and the reading was 0.13% which was reflected on Government Exhibit 8.

#### f.      Defendant second evidentiary test

The Government continued the same video from time 17:37:03 to 17:39:42

Ranger Montoya testified the segment of the video showed the two minute wait period and the second breath test.  He stated the instrument requires a two minute wait between the two tests.  The two minutes between the test is counted by the instrument, it shows a 120 second countdown during which time the instrument won't let you do anything.  The wait period is an indication the instrument is working properly.  Ranger Montoya stated the time period between the two test is to show there is no potential for mouth alcohol.  Ranger Montoya stated the result of second test was 0.14% which was reflected on Government Exhibit 8.

### 11.   Blood test

Ranger Montoya testified the instrument does not retain breath samples, and the Defendant was advised of that fact, and the Defendant requested blood sample. Ranger Montoya stated he arranged a blood draw, but it was not done right away because the paramedics were on a call that involved a transport so they were not readily available. The blood test was done after he was gone from jail, he did not know when it was done but it was not while he was at the Holding Facility which would have been at least a half hour after he had finished the booking process.

### 12.   Jurisdiction

Ranger Montoya testified the area where he first observed the vehicle is within Yosemite National Park and the location he stopped the vehicle is also in Yosemite National Park.

### 13.   Identification of Defendant

Ranger Montoya identified the defendant as the driver of the vehicle.

### C.   Government expert witness, Jessica Ms. Winn

### 1.   Background

Ms. Winn testified that she is employed at the California Department of Justice Bureau Forensic Services Fresno Crime lab as a Senior Criminalist.  She had been employed as such for nine and a half years.  She holds a BA in chemistry and an MA in forensic science, and she has specific training on alcohol analysis through the Department of Justice in alcohol analysis.  She has testified as an expert approximately 15-20 times.

On cross examination Jessica Ms. Winn described herself as a criminalist, which is not a degree but a title given by the California DOJ, which is a branch of law enforcement.  Ms. Winn has testified as an expert in 15-20 trials, for all of which she has been called by the prosecution.

Ms. Winn has published original work, but none of her publications have covered the reliability of a breathalyzer.

Ms. Winn had never seen Mr. McAdams before the trial.  She was not present when the chemical tests were administered and did not oversee the administration of the tests.

### 2.    Designation as expert

The Government moved to designate Ms. Winn as an expert in analysis of blood and breath samples for alcohol content, and with no objection from the Defendant, the Court accepted that designation.

### 3.    Drager Alcotest 7510

Ms. Winn testified she is familiar with the Drager Alcotest 7510 which is also referred to as a "PEBT" Portable Evidentiary Breath Test Device.  It is a handheld device that uses a fuel cell to determine the alcohol concentration in a subject's breath.  The whole instrument contains a keyboard for manual entry, a keycard swiper, a printer, and instruction on how to use the machine.  Ms. Winn stated the PEBT  is accepted in scientific community as method of measuring alcohol in breath samples.

On cross examination, Ms. Winn next explained how the dreager Alcotest works: the person blows into a mouthpiece and the chamber converts alcohol into electricity. Alcohol is present in your lungs after having been absorbed by the blood.  The dreager does not depend on a coefficient to determine BAC but measures the breath alcohol concentration directly.

### a.    instrument operation

The PEBT works by a subject blowing into the mouthpiece for a certain length of time to get a volume-sample, the instrument collects a small portion of breath and analyses it using a fuel cell which is like a battery.  It converts the alcohol into electricity. The more electricity, the higher the alcohol concentration.

### b.     accuracy checks

Ms. Winn stated the instruments are maintained by the Department of Justice Labs and accuracy checks are performed by the individual departments as are the uploads to the Department of Justice.  The Department of Justice gets the results of tests as the agencies are required to upload the results once a week to once every 15 days to the Department of Justice system. Those results can be obtained electronically through the Department of Justice.    When an agency does a breath test, the Department of Justice also electronically gets a copy of all tests both evidential test and accuracy checks.

The Government referred to Government Exhibit 4.  Ms. Winn testified that exhibit was a Breath Alcohol Subject Report which is generated when somebody searches for a breath test through the Department of Justice system.  Ms. Winn stated she is familiar with these reports, and Government Exhibit 4 was a report which included results from a test on July 23, 2016. She stated the report also showed accuracy checks dated from 6/27-8/18, 2016.  Ms. Winn stated that if the accuracy checks are not done every 10 days, the instrument will not allow any evidentiary testing or screening until an accuracy check is done.  If the instrument went more than 10 days without an accuracy check, an officer would have to do an accuracy check and it would have to be a passing accuracy check, before the instrument would allow testing.  Ms. Winn stated that based on the report, Government Exhibit 4, the instrument was working properly; based on tests prior, tests after, and the result themselves.

On cross examination, Ms. Winn reviewed the accuracy testing log for this specific device.  According to Defense Exhibit D, the expected value of each test was .10.  However, the device was reading .103 in July 2016, and .105 in August 2016.  This is within the permissible margin of error, but all but one reading was slightly higher than the expected value.

If this machine was beyond the .01 margin of error, Ms. Winn explained that the machine would be taken offline and the agency would determine what was wrong with the instrument.  It would not be allowed to be used in the field until that determination was made.

### 4.    Opinion of level of impairment for driving

She further stated she is familiar with the effects of alcohol on the ability to drive safely, and based on her training and experience it is her opinion that all persons are impaired and are unable to safely drive at 0.06% alcohol.

Ms. Winn testified that at the time of driving, if there was a BAC of 0.15% to 0.17% the Defendant would not have been able to safely drive.

On cross examination, Ms. Winn discussed when impairment begins.  In her opinion, impairment can start as early as .01 BAC in some individuals, but all individuals are impaired with a BAC of .06.  Ms. Ms. Winn acknowledged that some criminalists believe that impairment does not begin until 0.10.

### 5.    Elimination or 'burn off"

She stated alcohol is eliminated primarily through body metabolism, and it can also be eliminated through breath, perspiration, and urine.  Elimination or "burn off" refers to how quickly the body removes alcohol from the system.  The range of acceptable burn off rate is .015% to .025% per hour, and the average is .018% to .022% per hour.  That is equivalent to approximately 1 drink per hour.  Ms. Winn stated the BAC level in a test does not measure unabsorbed alcohol, it only measures what is being distributed in the body.

### 6.    Absorption

Ms. Winn testified that if someone has eaten, it will slow down the absorption and produce lower alcohol concentration in the body.  For instance if the defendant, stopped at 4:10 pm, had one beer the night before and ate a sandwich the night before then his BAC would be expected to be zero.   Ms. Winn stated, for a male who weighed 150lbs,

one drink would bring his BAC to approximately .027%.  For a male weighing 150lbs, to reach a level of 0.13%, he would have to have approximately 4½ to 5 drinks without any elimination and assuming full absorption. Ms. Winn explained that full absorption on an empty stomach take 15-30 minutes, and with food in the stomach, full absorption would take approximately 60 minutes.

Ms. Winn testified her statement that the Defendant's BAC of 0.15% to 0.17% at the time of driving was calculated assuming full absorption.  If the Defendant has 1 beer 15 minutes prior to being stopped, his BAC be approximately 0.12-0.14%.  Ms. Winn explained that calculation is assuming there is one beer not absorbed at the time of the stop.   After 1.5 hours, whether there was food on the stomach or not, a person would not have any alcohol in their stomach.

Ms. Winn testified that if the defendant stopped drinking in Wawona, he would be fully absorbed when stopped at 4:10PM.

On cross examination, Ms. Winn stated absorption times can range from 15 minutes to 60 minutes depending on whether alcohol is consumed on a full or empty stomach.  By 60 minutes, most people have absorbed all of the alcohol in their stomach. However, this range is an average and some people take longer than 60 minutes to absorb alcohol.  If Mr. McAdams was not fully absorbed at the time of the test, Ms. Winn might not be able to estimate his BAC at the time of driving.  Testing in the absorption phase is challenging because the test results do not accurately reflect the amount of alcohol in the subject's body.

### 7.    Observation period

Ms. Winn testified that the standard procedures of the PEBT call for a 15 minutes observation period, to dissipate any potential mouth alcohol from the subjects mouth. If a person eats, drinking, or chews, there could be remnants of alcohol in the food that could be holding onto the alcohol.  Ms. Winn explained that is one reason the subject can't have anything in their mouth for the 15 minutes prior to the test.  Additionally, if

there is alcohol in the stomach and the subject burped or regurgitated, they could put alcohol into their mouth, and that is another purpose of the 15 minute observation period, after 15 minutes any mouth alcohol would have dissipated.

Ms. Winn testified a person would have to have alcohol in their stomach to burp or vomit mouth alcohol.  A person who had not consumed any alcohol for 1 hour and 15 minutes prior to the test would not have any alcohol in their stomach, so if they burped or vomited they would not produce any mouth alcohol.  Ms. Winn stated if there was a break in the observation period and a person during that 15 minutes burped unobserved but had not eaten or consumed any alcohol in 1 hour and 15 minutes that burp or vomit would not effect mouth alcohol.

On cross examination, Ms. Winn agreed that proper administration of the breath test is paramount for obtaining accurate results.  This is why California passed Title 17, which codifies proper administration.  One such procedure is the 15-minute observation period.

### 8.      Initial test attempt

Ms. Winn confirmed she had observed video played earlier by the parties while in the courtroom.  She testified she observed the video showed an instance that the instrument was not able to take reading.  She confirmed it was not a failure in instrument.

### 9.      Evidentiary breath tests

She stated she observed on the video Ranger Montoya waited 2 minutes between tests, and the tests were completed properly.

Ms. Winn referred to Government Exhibit 4, and she stated the result of breath test 1 was 0.13%, and the results of breath test 2 was 0.14%.  She further stated the difference between two tests was an acceptable difference.

Ms. Winn testified the results were not impacted by mouth alcohol, and they were consistent with reliable tests.  She stated if there had been mouth alcohol there would be

an abnormally random result, usually substantially higher.    The ratios would not be acceptable range, if there was mouth alcohol.  Ms. Winn stated there was nothing in the video, test results or ranger testimony that would make her think the results are not accurate, and the two minute interval is in part for mouth alcohol dissipation and to make sure there was enough time between 2 tests.

Ms. Winn testified the subject's name on Government Exhibit 4 was McAdams, Kenneth, that the report showed air bank of 0.00, and the test at 17:37:13 was 0.13% and the test at 17:39:55 was 0.14%.  The time on the report comes from the machine itself, it is not input by rangers.    Ms. Winn stated the report does not indicate any abnormalities in the test.

Ms. Winn testified that based on the breath results of 0.13% and 0.14%, assuming defendant had absorbed all alcohol at the time of the stop, his alcohol at the time of driving, at approximately 4:00 pm, was 0.15% to 0.17% alcohol.    Ms. Winn stated "absorption" refers to time it takes alcohol to go into the body completely.

On cross examination, Ms. Winn stated that the preliminary breath test results are consistent with the evidentiary breath test results, assuming that the preliminary breath test was working correctly.

### C.    Defense expert witness, Stanley Dorrance

#### 1.    Background

Mr. Dorrance describe himself as a criminalist with Forensic Science Services in Fresno, CA.    He received a Bachelor of Science degree in Criminalistics from UC Berkeley.  He was employed by the CA DOJ and assigned to the regional crime lab in Fresno from 1972-1982.  During his time with the DOJ, his duties involved the analysis of breath, blood, and urine samples for alcohol.  He was a forensic alcohol supervisor and was called as an expert on approximately 500 occasions to render testimony regarding alcohol.  At times, Mr. Dorrance was responsible for the training of police officers in the proper use of breath testing devices and the procedures thereto.  In 1982,

1   he retired from the DOJ and became self-employed.  Since 1982, he has testified

2   approximately 3000 additional times.  Mr. Dorrance is a National Highway and Traffic

3   Safety Administration Field Sobriety Test Instructor.

**2.    Designation as expert**

5   The court qualified Mr. Dorrance as an expert in the areas of forensic alcohol

6   analysis,  proper  administration  of  the  chemical  tests,  and  administration  and

7   interpretation of the field sobriety tests.

**3.    Absorption**

9   Mr. Dorrance explained that alcohol goes into the stomach and starts to be

10  absorbed by the stomach walls.  It then moves into the small intestines, where it is

11  further absorbed.

12  Regarding absorption times, Mr. Dorrance explained that studies test when

13  individuals reach their maximum or peak BAC and this varies significantly.  One study by

14  Jones shows that when people take straight shots of whiskey on an empty stomach they

15  can take as little as 15 minutes or as long as 105 minutes to reach their peak BAC.

16  Once you've reach your peak you keep absorbing—but absorption falls off because the

17  elimination rate exceeds the absorption rate.  The plateau period is when the absorption

18  rate and the elimination rate are the same.  Burn off rate during the elimination phase is

19  about .10-.25, but the average is between .15-.18.

20  Mr. Dorrance opined that there are issues with testing during the absorptive

21  phase because studies show that breath alcohol levels can overstate blood alcohol

22  concentrations by 270%.

23  Regarding Ms. Winn's hypothesis of Mr. McAdams's BAC, Mr. Dorrance stated

24  that her hypothesis depends on full absorption, of which there is no evidence so it is

25  simply a guess.

26  Mr. Dorrance acknowledged that absorption can take up to 105 minutes.  And if

27  Mr. McAdams had burped or regurgitated, it is possible that mouth alcohol could affect

28

the test if there was still alcohol in the stomach, which after 90 minutes, was still a possibility.

On cross examination, Mr. Dorrance acknowledged it would be unlikely that defendant would have alcohol unabsorbed in his system after 2 hours.

### 4.    Breath tests

Mr. Dorrance acknowledged that the results of the preliminary breath test were generally consistent with the evidentiary breath test results.  If McAdams was in the elimination phase during both the PAS and the EPAS—McAdams should have gone down to a .13.  The .14 did seem high, but Mr. Dorrance explained that breath machines are not perfect.

Regarding the proper administration of the breath test, Mr. Dorrance opined that officers must use different mouthpieces for the two test, complete an air blank test, and observe the subject for 15 minutes prior to administering the test.

On cross examination Mr. Dorrance acknowledged the preliminary breath test and the evidentiary breath test results are not incompatible.  He stated the reason there are 2 tests is to be sure there was nothing "hanging around to cause any problems"  Mr. Dorrance stated the results of 0.13% and then 0.14% are acceptable results under title 17.

Mr. Dorrance testified breath alcohol is alcohol that is loose in the mouth, not trapped by anything.  He stated that "if you blow one result, you are going to blow almost all that alcohol at of your mouth.  So when you blow a second the mouth alcohol that affected the first, would not affect the 2nd result, and typically you would get a very high results followed by a very low result. It is rare that they would be within acceptable limits of .02%"

Mr. Dorrance acknowledged that the "whole point of 2 tests is if they are consistent, you know you have a good reading."  He stated that if you have a good

reading, that is an indication there is nothing wrong with the tests, it doesn't validate the machine itself.

Mr. Dorrance acknowledged no second preliminary test was done by the rangers in the field and a second test is recommended.  With only a single preliminary test there can't be a "whole lot of credence in that single test."  Without a second preliminary test result there can not be a definitive conclusion that BAC was declining.

Mr. Dorrance acknowledged "one could say" the results of the preliminary breath test and the evidentiary test were consistent with declining blood alcohol.

### 5.    Field sobriety tests

Regarding the field sobriety tests, Mr. Dorrance noted several problems.  These tests were first studied in the late 70s and 80s.  NHTSA commissioned private parties to conduct studies and standardize the tests.  The researchers determined that three tests could be standardized: the horizontal gaze nystagmus, the walk and turn, and the one legged stand.  The committee attempted to standardize the tests so that officers could conduct them in the same manner, score them the same, and theoretically come to the same conclusions.  But there are some major problems.

To standardize the tests, researchers went to checkpoints, and if someone admitted to drinking or had alcohol on their breath, these individuals became subjects of the study.  All of the officers who administered the test were trained by NHTSA on how to conduct the tests correctly, and someone from NHTSA watched each officer while he or she conducted the tests.

In the field, however, 95% of officers do not conduct the HGN test correctly.  Even though the NHTSA studies come to certain conclusions, they do not reach these conclusions using real world data.  The field sobriety tests are misleading and difficult for the average person to complete—40% of sober people cannot do these tests correctly.

From Mr. Dorrance's observations of field sobriety test videos, he has seen cases where officers detect six clues during the HGN on individuals with a BAC as low as .02.

### 6.     Observation period

Mr. Dorrance explained that the 15-minute observation period is important to ensure that nothing could have happened that would have compromised the test.  Mr. Dorrance stated that he has testified at a DMV hearing where an improperly administered test was excluded from evidence because there, violations of Title 17 go to the admissibility of the test.

Nonetheless, due to the timing of the evidentiary breath tests, Mr. Dorrance stated it was unlikely that mouth alcohol affects the results of the breath tests.

### 7.     Plateau phase

The preliminary breath test results and the evidentiary test results do not suggest that Mr. McAdams was in the plateau phase because plateau phase does not last for an hour.  But it is possible that Mr. McAdams's BAC was rising during the preliminary breath test and eliminating during the evidentiary breath test.

## III.     Exhibits Entered Into Evidence

- Government Exhibit 1 and Defense Exhibit 1:  Video Body Camera footage: PICT0008_2016.07.23_23.07.16.AVI
- Government Exhibit 3:  Ranger Jason Montoya certificate of training in DWI Detection and Standardized Field Sobriety Testing Course
- Government Exhibit 4:  California Department of Justice – Breath Alcohol Subject Report
- Government Exhibit 6 and Defense Exhibit 2:  Holding Facility Video, Booking 1
- Government Exhibit 7 and Defense Exhibit 3:  Holding Facility Video, Booking 2
- Government Exhibit 8 and Defense Exhibit 4:  Alcotest 7510 printout

///

///

///

///

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.     Analysis

### A. Evidentiary Objections

#### 1.  Ranger  Montoya Testimony Regarding  Nystagnus

As noted, the Defense objected to testimony from Ranger Montoya as to his observations regarding Defendant's performance on horizontal gaze nystagmus ("HGN") evaluation and the Ranger's interpretation of the results of that procedure.   The testimony was permitted subject to Defendant's maintained objection and the Court's evaluation of supplemental briefing on the issue.   The supplemental briefing has been received and considered, (See ECF Nos. 40, 42, & 45..)

The Defense objects that Ranger Montoya was not designated or disclosed in any pretrial filings as an expert witness on HGN evaluation procedures or the interpretation of the results of those procedures and notes that the Government did not ask the Court to qualify the Ranger as a trial expert under Federal Rule of Evidence 702.   As Defendant correctly notes (ECF No. 40, 4:26-5:4), Rule 702 permits a witness to give expert testimony only if it is based on sufficient facts or data and is the product of reliable principles and methods, and the witness has applied those principles and methods reliably to the facts of the case.  It is the trial court's duty to ensure the testimony "rests on reliable foundation and is relevant to the task at hand."   Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579, 597 (1993).   The trial judge has broad latitude in making this determination.  Kumbo Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999).

The Government responds, not by disputing the expert nature of Ranger Montoya's testimony regarding nystagmus or claiming that the government moved, successfully, to have him qualified as an expert, but by relying on a holding in this district that a qualified law enforcement officer may in a proper case provide such expert testimony.  In United States v. Nguyen, D.C. No. CR F 06-0075 AWI, 2008 WL 540230 (E.D. Cal. Feb. 25, 2008), the District Court considered this issue in reviewing and affirming a criminal conviction of a defendant for operating  a motor vehicle with a blood alcohol content of 0.08% or greater in violation of 36 C.F.R. § 4.23(a)(2).   The topics

33

addressed by the law enforcement ranger in her testimony at the trial in that case and the defense challenge to that testimony are so similar to those in this case as not to warrant repeating.

The District Court's description of nystagnus and HGN testing, as well as other Courts' approach to the issue of expert testimony on same is informative:

> Nystagmus is a "jerkiness of eye movement." United States v. Apeland, 2007 U.S. Lexis 15666, *3 n. 1 (9th Cir.2007); United States v. Van Griffin, 874 F.2d 634, 636 (9th Cir.1989). More particularly, nystagmus is "an involuntary rapid eye movement of the eyeball, which may be horizontal, vertical, or rotary. An inability of the eyes to maintain visual fixation as they are turned from side to side (in other words, jerking or bouncing) is known as horizontal gaze nystagmus." Van Hazel, 468 F.Supp.2d at 797. The HGN test relies on the scientific principle that alcohol will cause a type of nystagmus, which in turn can be detected by a properly trained officer. See Hulse v. State, 289 Mont. 1, 961 P.2d 75, 94 (Mont. 1998); People v. Leahy, 8 Cal.4th 587, 607, 34 Cal.Rptr.2d 663, 882 P.2d 321 (1994).

> In contrast to the psychomotor field sobriety tests, it appears that a majority of jurisdictions view the HGN test as being scientific in nature and not within the common understanding of lay persons. See Van Hazel, 468 F.Supp.2d at 796; but see State v. Boczar, 113 Ohio St.3d 148, 863 N.E.2d 155, 160 (Ohio 2007). In California, HGN tests are considered scientific in nature. Leahy, 8 Cal.4th at 607, 34 Cal.Rptr.2d 663, 882 P.2d 321.12 However, because a published California appellate decision has held that HGN testing is generally accepted in the relevant scientific community, see People v. Joehnk, 35 Cal.App.4th 1408, 1508-09 (1995), no scientific expert testimony is required and a police officer may report the results of an HGN test provided that a foundation is laid that the test was administered properly and that the officer is qualified, i.e. has the requisite training and experience to administer the test. See Leahy, 8 Cal.4th at 611, 34 Cal.Rptr.2d 663, 882 P.2d 321. It does not appear that the Ninth Circuit has addressed the admissibility of the HGN test.

> Two lower federal courts have addressed the admissibility of HGN tests, post-Kumho Tire. In Horn, after a detailed analysis of case law from the states, as well as various studies and scholarly opinion, it was held that the HGN test is scientific or technical in nature and that the results of a properly administered HGN test is admissible as circumstantial evidence of impairment. Horn, 185 F.Supp.2d at 555 & n. 43, 560-61. Horn held that if the arresting officer is the sponsor of such evidence, the officer's foundational testimony should be limited to experience and training in

administering the HGN test. See id. at 561. If that foundation is met, then the officer is limited to testifying about his administration of the test and whether exaggerated nystagmus was detected. See id. Unless the officer is qualified as an expert under Rule 702/Daubert, the Horn Court prohibited any opinion testimony by the officer as to the reliability of the methods and principles underlying the HGN test, the accuracy of the HGN test, and the causal nexus between exaggerated nystagmus. See id.

In Van Hazel, the District Court stated its agreement with the state courts that had held that the HGN test is a scientific test. See Van Hazel, 468 F.Supp.2d at 797. That court declined to take judicial notice of either the connection between alcohol ingestion and nystagmus or the reliability of HGN testing. See id. The Van Hazel court also noted that experts have differing opinions as to the reliability of the HGN test. See id. Because the administering officer did not have the required qualifications, he could not testify as to the reliability of the HGN test. See id.

Although it did not deal specifically with an HGN test, the Volk decision is instructive. In Volk, the results of an HGN test were never admitted, but the results of other field sobriety tests were. See Volk, 57 F.Supp.2d at 891. On appeal to the district court, it was argued that the magistrate court had erred by not holding a formal Daubert hearing. See id. The Volk court noted that the magistrate court had found the officer's testimony reliable based on the officer's experience and training, and also observed that Kumho Tire had made clear that courts have broad discretion in determining whether expert evidence is reliable under Rule 702. See id. at 891, 895. The Volk court found no abuse of discretion by the magistrate court and explained:

> Although the court declined to hold an evidentiary hearing or formally apply the Daubert factors, the record reflects an adequate consideration of the reliability of the testimony before admitting it. In essence, the court found that the testimony by a police officer who has specialized knowledge and experience with regard to intoxication and the nature of field sobriety testing was sufficiently reliable that no further analysis was required.

Id.; see also United States v. McGavock, 2005 U.S. Dist. LEXIS 24615, *13 (W.D. Va. 2005) (holding that "the officers testified as to their training in conducting field sobriety tests, and that the tests performed on the defendant [including the HGN] were in accordance with standard procedures and their training. The reliability of these tests as administered in this case therefore was established.")

Nguyen, 2008 WL 540230, at *10-12.

The District Court in Nguyen concluded:

> This Court agrees that an HGN test is not based on common knowledge and understanding of the effects of alcohol on a person. Instead, the HGN test is based on a scientific principle that is not commonly known, i.e. that consumption of alcohol is a cause of exaggerated nystagmus. To administer the test and recognize the presence of exaggerated nystagmus requires specialized training and knowledge. Because of the scientific foundation and specialized knowledge and training necessary to detect nystagmus, Rule 702 applies and any testimony about an HGN test and the results thereof must be reliable. See Fed. R. Evid. 702. However, as Kumho Tire made clear, a court has great flexibility in determining reliability so as to deal with "cases where the reliability of an expert's methods is properly taken for granted." Kumho Tire, 526 U.S. at 152.
>
> Depending on the extent of an officer's testimony, an HGN test falls into the category of cases where reliability of methodology may be taken for granted. See Kumho Tire, 526 U.S. at 152. Published cases from across the country make clear that the method for determining the presence of exaggerated nystagmus is not complex and such evidence is routinely introduced in trials, under either Frye or Daubert based state rules of evidence. [Numerous citations omitted.] It is also well established that alcohol can cause exaggerated nystagmus. [Even many more numerous citations omitted.] Congruently, the Ninth Circuit recently stated that nystagmus "is one indication that a suspect is intoxicated." Apeland, 2007 U.S. Lexis 15666 at *3 n. 1. Given this agreement, judicial notice may be taken of the fact that alcohol consumption can cause exaggerated nystagmus. See Horn, 185 F.Supp.2d at 555. Since officers routinely apply and rely on the principle that alcohol can cause exaggerated nystagmus, and since judicial notice of this fact is appropriate, the Court sees no reason why a police officer should be prohibited from testifying that alcohol can cause exaggerated nystagmus, so long as he can show that he was taught this fact as part of his training. But see Horn, 185 F.Supp.2d at 561. It is true that there are many other things that can cause exaggerated nystagmus. See Schultz, 664 A.2d at 77. However, these additional causes may form the basis of a request for judicial notice or an effective cross examination. See Horn, 185 F.Supp.2d at 556 n.45; Balbi, 874 A.2d at 295; Dahood, 814 A.2d at 167; O'Key, 899 P.2d 689 n. 46.
>
> Given the above, the Court holds that, if an officer establishes that he has had the requisite training and experience in administering an HGN test and detecting exaggerated nystagmus, and part of that training included the fact that alcohol consumption may cause nystagmus, then the officer may testify about his administration of the HGN test, whether exaggerated nystagmus was detected, and that alcohol

1

2

3

4

> consumption can cause exaggerated nystagmus. <u>See</u> <u>McGavock</u>, 2005 U.S. Dist. LEXIS 24615 at *13; <u>Volk</u>, 57 F.Supp.2d at 895-96; <u>cf.</u> <u>Horn</u>, 185 F.Supp.2d at 560-61. However, any testimony that is more in depth about exaggerated nystagmus or the HGN test will require a greater showing of reliability under Rule 702. <u>Cf.</u> <u>Van Hazel</u>, 468 F.Supp.2d at 797; <u>Horn</u>, 185 F.Supp.2d at 560-61.

5

<u>Id.</u> at *12-13 (footnote omitted).

6

7

8

The undersigned finds the District Court's reasoning and conclusions in <u>Nguyen</u> to be well founded and consistent with existing law.  Accordingly, it adopts and applies them here.

9

10

11

12

13

14

15

16

As noted, Ranger Montoya has been a law enforcement ranger since 2007 and a supervisor for 1 year.  His training included a seasonal academy, and completion of the FLECT program in 2009.  He had specific training in DUI investigation in both seasonal academy and FLETC. The training included identifying vehicles, performing investigations, and conducting standard field sobriety tests (FSTs), and the training at FLETC was conducted in accordance with National Highway Traffic Safety Administration (NHTSA) standards.  He was trained to administer field sobriety tests, including the Horizontal Gaze Nystagmus (HGN) procedure. (ECF No. 41, 9:13-10:11.)

17

18

19

20

21

22

23

Ranger Montoya has received training in HGN in both the seasonal academy and FLETC, to include the effect of alcohol consumption on HGN.  He has conducted HGN tests in the field on subjects 50-100 times and trained others in SFST as a field-training ranger and instructor at Santa Rosa Junior College.  In the course of serving as a trainer and on the job, he has conducted HGN tests 100-200 times in his career.  Also in the course of his career, he has participated in 5-10 DUI investigations per year which resulted in 3-5- arrests per year for DUI. (<u>Id.</u>)

24

25

26

27

The Court finds that such training and experience qualifies Ranger Montoya to conduct HGN evaluations and to present testimony on the proper method of conducting such evaluations and interpreting their results. He established that he had the requisite training and experience in administering an HGN test and detecting exaggerated

28

nystagmus, and that part of that training included the fact that alcohol consumption may cause nystagmus.

In this case, Ranger Montoya testified that on HGN testing of Defendant on the day in issue, he "observed the lack of smooth pursuit in both eyes, distinct and sustained Nystagmus at maximum deviation in both eyes and onset prior to 45 degrees in both eyes, as well as vertical nystagmus in both eyes." (ECF No. 41, 16:10.)  He described these results as "exaggerated nystagmus" which can be caused by alcohol and which indicated a person who "may be impaired".  (Id. at 16:8-14.)

The court finds that such testimony constitutes competent qualified evidence that at the time and place at issue in this case Defendant showed nystagmus on testing consistent with impairment including, but not necessarily limited to, impairment by alcohol.

That finding does not resolve all of Defendant's objections to Ranger Montoya's testimony regarding HGN.  He also challenges that testimony on the ground that the Government failed to disclose Montoya as an expert witness in pretrial discovery.  The Court requested further supplemental briefing on this issue.  (ECF No. 47.)  The parties provided same at ECF Nos. 48, 49, & 50, and the Court has considered it.

Reciprocal discovery was ordered at the arraignment of Defendant on August 30, 2016. (ECF No. 3.) The Government undertook to comply with its discovery obligations with regard to Ranger Montoya by providing a copy of the criminal Complaint against Defendant, including the statement of probable cause, Ranger Montoya's report and detailed summary of his DUI investigation of Defendant, to include his description of the HGN testing of Defendant, and information as to Ranger Montoya's training and experience in these areas. (See ECF No. 49 at 2:2-21.)   In Court-directed pretrial exchanges, the Government listed Ranger Montoya as a trial witness and listed as proposed exhibits video body camera footage which included the HGN evaluation procedure and Ranger Montoya's "certificate of training in DWI Detection and

1   Standardized Field Sobriety Testing Course."

2          Nevertheless, the Defense claims surprise and prejudice in the testimony of

3   Ranger Montoya on these subjects.  Given the disclosures made to Defendant and the

4   holding of the Eastern District of California in Nguyen, supra, the Court finds that

5   Defendant's claim of surprise constitutes creative disingenuity.  Given what was

6   disclosed, certainly the Defense had to anticipate precisely the testimony given by

7   Ranger Montoya.  The fact the defense designated Stanley Dorrance, a criminalist and

8   founder of forensic science services, as an expert witness in the areas of forensic

9   alcohol analysis, proper administration of the chemical tests, and administration and

10  interpretation of the field sobriety tests (ECF No. 41 at 29:21-24) is some evidence it did

11  so anticipate.  Regardless, he was there and certainly competent to reply to any opinion

12  evidence offered by Ranger Montoya, another fact which helps show a lack of prejudice

13  to Defendant.  It is disturbing to the Court that the Government did not designate Ranger

14  Montoya as an expert; no reason was given as to why it did not other than "Under

15  Nguyen, we didn't have to." At the same time, there is no evidence the decision was

16  willful or motivated to gain a tactical advantage; any such objective would have been

17  incompatible with what was disclosed. Sustaining Defendant's objection and disallowing

18  Ranger Montoya's testimony on HGN testing and interpretation of results would be

19  disproportionate under such circumstances.  See United States v Finley, 301 F.3d 1000,

20  1018 (9th Cir. 2002) ("Exclusion is an appropriate remedy for a discovery rule violation

21  only where 'the omission was willful and motivated by a desire to obtain a tactical

22  advantage.'" (Citation omitted)).

23          Finally, the Court notes further that Defendant's supplemental briefing reveals his

24  real (only?) objection is to Ranger Montoya's claim of a causal link between alcohol

25  consumption and nystagmus. (ECF Nos. 48 at 3:8-9, and 50 at 4:7-11.)  As noted, this

26  Court, as did the Court in Nguyen, judicially notices the evidence in support of that

27  connection.

28          For all of the foregoing reasons, Defendant's objections to Ranger Montoya's trial

testimony regarding HGN testing and his interpretation of the results of same are overruled.

## 2. Evidentiary Breath Test Results

Defendant also objected to Ranger Montoya's presentation of testimony, over and subject to Defendant's continuing objection, regarding the results of a portable alcohol screening breath test administered to Defendant using the Dragger Alcotest 7510 machine provided by the California Department of Justice.

As described by the Government's qualified expert, the Alcotest is a handheld device that uses a fuel cell to determine alcohol concentration in a subject's breath by converting alcohol in the breath into electricity, which is measured to reflect and record the alcohol concentration of the breath sample.  (ECF No 41 at 23:24-24:8.) The test is accepted in the scientific community as an accurate measure of alcohol in a breath sample. (Id. at 24:2-3.)

Defendant does not question the evidentiary value or reliability of the Alcotest generally, but challenges the results generated in this case because of an alleged failure by Ranger Montoya to precisely follow the protocol for proper administration of the test as necessary to ensure its reliability, specifically his alleged failure to personally observe and monitor Defendant for fifteen continuous minutes immediately preceding the administration of the Alcotest.  (ECF Nos. 39 and 46.)

The Court allowed evidence of administration of the test and interpretation of its results, subject, however, to Defendant's continuing objection and the Court's review of supplemental briefing on the issue.  That briefing has been received and considered. (ECF Nos. 39, 43, and 46.)

Observation of an Alcotest subject for fifteen minutes prior to administration of the test is a prerequisite to its accurate administration. Cal. Code Regs., tit.17 §§ 1221.1, 1221.2.  The observation period is to ensure that all potential mouth alcohol has been dissipated and that no new source of alcohol has been introduced into the subject's mouth by eating, chewing, drinking, burping, regurgitating, or the like.  Cal. Code Regs.,

1  tit. 17, § 1221.1(b)(1). (ECF No. 41 at 27:8-17.)

2  　　　Here, Ranger Montoya acknowledged that he was doing paperwork, taking drinks

3  of water, and talking to other rangers during the period of observation of Defendant in

4  the booking room where the Alcotest was administered.  At one point he left the room to

5  step into an adjoining hallway to ask another ranger to process Defendant's vehicle and

6  complete paperwork on it, and he opened a door to let a ranger exit.  A third ranger was

7  present in the booking room when Montoya stepped out and  made no report of anything

8  unusual having happened during Montoya's absence.  Montoya would have expected to

9  have been advised if anything had happened.  (ECF 41 at 19:1-18.)  Montoya was

10  absent from the room twice.  (ECF No. 39 at 3:16-19.).  Review of the booking facility

11  video and its simultaneously recorded time clock reveals that, at about 5:21 PM, during

12  the observation period, Ranger Montoya left the booking room for 50 seconds; however,

13  Ranger Wentz remained present and was fingerprinting Defendant while Montoya was

14  out.  Montoya stepped out again for 56 seconds at 5:23 PM; Ranger Wentz was with

15  Defendant for all but 23 seconds of this latter period.  (Government Exh. 6.)  The first

16  Alcotest was at 5:36 PM, one and a half hours after Defendant was first stopped and

17  stepped out of his car.

18  　　　Except for the brief intervals described above and possibly during Defendant's

19  transport to the jail (if by an officer other than Montoya), Defendant was in the presence

20  of Ranger Montoya continuously from about 4:06 PM through completion of the Alcotest.

21  (ECF No. 41.)  Defendant was not out of Montoya's sight and did not get back into his

22  car at any time after the beginning of field sobriety testing and transport to the holding

23  facility. (ECF No. 41 at 17:9-11.)  Neither Ranger Montoya nor Ranger McGahey, also

24  present, saw Defendant put anything into his mouth during this period. (Id.)  Search of

25  the Defendant revealed no food, alcohol, gum, or anything that could be chewed on his

26  person. After the FST was completed, Defendant was handcuffed with his hands behind

27  his back and placed in a law enforcement vehicle for transport to the holding facility; it is

28  not likely one so handcuffed could get his hands to his mouth. (Id. at 17:12-17.)  Search

41

1   of the Defendant at the holding cell revealed no food, drinks, gum or anything that could

2   be chewed.  (Id. at 17:21-24.)  After the search, Defendant was placed in a small, eight

3   foot by six foot wire mesh booking cell visible to rangers. (Id. at 17:2-18:3.)  No one saw

4   Defendant put anything into his mouth, burp or vomit during the one and one half hour of

5   time between when Defendant stepped out of his car at Montoya's request and

6   administration of the Alcotest.

7        Defendant reportedly advised Ranger Montoya that he had last eaten and

8   consumed alcohol (one beer) the night before his arrest. (Id. at 13:9-10).   There is

9   evidence, though it is not overly compelling, that Defendant had consumed alcohol at the

10  Wawona Hotel an hour or an hour and one half prior to being pulled over by Ranger

11  Montoya.  (Id. at 2:1-6:12.)  The Government's expert witness, Jessica Winn, testified

12  that one who had consumed no alcohol within the hour and 15 minute period prior to the

13  administration of the Alcotest would not have unabsorbed alcohol in his stomach at the

14  time of the test; as a result burping or vomiting would not have produced alcohol in the

15  mouth of that person.  (Id. at 27:18-24; see also id. at 26:27-27:3 (regarding her views

16  on the time for absorption of alcohol from the stomach).)  She also testified that burping

17  or anything that would have put alcohol in Defendant's mouth before either of the two

18  Alcotest procedures would have caused an abnormal, or substantially higher, result on

19  one of the tests and there was no such abnormality.   Based on her review of the

20  evidence, including the holding facility video, she saw nothing to suggest the results of

21  Defendant's Alcotest by Montoya were less than accurate. (Id. at 28:12-17.) Defendant's

22  expert, Stanley Dorrance, agreed as to the significance of the consistency of results, and

23  the lack of reason to doubt the accuracy of the Alcotest results.

24       Mr. Dorrance did challenge Ms. Winn's conclusion that all alcohol would have

25  been fully absorbed by Defendant within 60 minutes of it having been consumed.  Still,

26  he thought it unlikely Defendant would still have unabsorbed alcohol in his system two

27  hours after having consumed it.  (Id. at 31:9-18.)

28       It is undisputed that the accepted protocol for administration of the Alcotest calls

42

1    for the 15 minute observation period described above. Cal. Code Regs., tit.17 §§ 1221.1,

2    1221.2.  Defendant contends that Ranger Montoya's failure to personally and directly

3    observe Defendant for a continuous 15 minute period immediately preceding testing

4    effectively voids the test and renders its results inadmissible.

5            Defendant relies on United States v. Daniels, No. CR-05-00184 MAG, 2005 WL

6    2463726, at *1 (N.D. Cal. Oct. 4, 2005) in support of this proposition.  There, the Court

7    denied without prejudice a motion to suppress evidence of a breath sample where the

8    parties disputed whether the defendant had been observed for the requisite fifteen

9    minutes. In so doing, the Court concluded that, "if Mr. Daniels was not observed for at

10   least fifteen minutes prior to the first breath sample, the method used to administer the

11   entire breathalyzer test would have been so unreliable as to warrant exclusion, under

12   Rule 702." Id. The defendant was granted leave to renew the motion "at trial after

13   testimony is taken and evidence introduced on this question." Id. at *2. However, this

14   opinion contains no discussion regarding the nature of the factual dispute and is

15   therefore unrevealing regarding whether the court truly meant that absolute literal

16   compliance with all protocols for proper administration of the test would be required for

17   admissibility or whether substantial compliance sufficient to ensure reliability of results

18   would be sufficient. In the subsequent decision following trial, the court concluded that

19   the defendant "was indeed observed at close range for at least 15 minutes before the

20   sample was taken," and therefore the test results were admissible, despite "a number of

21   clerical and administrative errors" on the part of the officer. United States v. Daniels, No.

22   CR-05-00184 MAG, 2006 WL 20550, at *2 (N.D. Cal. Jan. 4, 2006).

23          In United States v. Brannon, 146 F.3d 1194, 1196 (9th Cir. 1998) as amended,

24   (Sept. 21, 1998), the Ninth Circuit likewise concluded that absolute, technical compliance

25   is not required for admissibility. Brannon upheld the denial of a motion to suppress

26   evidence of the results of breath testing which did not comply with protocol for the

27   number of tests to be administered.  After itemizing the steps recommended for

28   producing "the best test", the Brannon court observed:  "Omission of these safeguards

1   lowers the reliability of the tests, it does not eliminate them as scientific aids to a

2   factfinder investigating drunkenness." Id.; see also United States v Seong Ug Sin, No.

3   CR10-5332RBL, 2011 WL 13193271 (W.D. Wash. Dec. 20, 2011) (affirming, based on

4   Brannon,  a Magistrate Judge's admission of breath test results over challenges based

5   on test administration, including challenge to lack of 15 minute observation period).

6   Along these lines, California decisions, though not binding on this Court, have

7   consistently held that deficiencies in following the protocols for such tests should  go to

8   the weight of the evidence not its admissibility.  People v. Hallquist, 133 Cal. App. 4th

9   291, 297 (2005) (14 minute observation period and only one test); People v. Williams, 28

10  Cal. 4th 408 (2002) (13 minute observation period and only one test).  See also People v

11  Adams, 59 Cal. App 3rd 559 (1976); People v Rawlings, 42 Cal. App. 3d 952 (1974).

12       This Court, not surprisingly, agrees with Brannon and the above-cited California

13  cases: Failure of literal compliance with every detail of the protocol for administration of

14  the Alcotest will be considered in determining how much weight should be given to the

15  results of the test, but not foreclose consideration of those results. To hold otherwise

16  would champion form over substance, particularly in a case like the present.  Here,

17  according to all the evidence, the observation period coincided with a time frame in

18  which the evidence makes it virtually certain Defendant did not do, and could not have

19  done, anything to produce alcohol in his mouth. Whether he had last consumed alcohol

20  the night before, or at the Wawona hotel an hour and a half before the stop by Ranger

21  Montoya as suggested by Government witness Thomas, or even, hypothetically,  if he

22  had consumed some beer while driving to the stop (there is no evidence to that effect

23  and no evidence he had beer on his breath at the stop), the persuasive expert opinion

24  testimony suggests the extreme unlikelihood he would still have unabsorbed alcohol in

25  his system by the time the Alcotest was administered. While in the presence of law

26  enforcement rangers, he had no opportunity to eat or drink anything. There is no

27  indication anywhere that Defendant at any time while in custody burped or vomited. At

28  least one ranger was directly across from Defendant for all but about one and one half

1   minutes of the observation period and Ranger Montoya was within hearing distance of

2   him when he stepped into the hallway during one of the absences, and yet no one saw

3   or heard the Defendant burp or vomit.  Even if he had, the weight of the evidence is that

4   there would have been no unabsorbed alcohol still in his stomach capable of being

5   regurgitated into his mouth.  There was no deviation in results as would have been

6   produced had one of them been affected by mouth alcohol. It appears all other

7   procedures for proper administration of the Alkotest and validation of its results were

8   followed precisely.

9       For these reasons, the Court will overrule Defendant's objection to admissibility of

10  the test results.  The Court will consider those results in determining Defendant's guilt or

11  innocence.  The weight given them and the other evidence is discussed below**.**

12          **B. Evaluation of the Evidence**

13      The evidence that Defendant, while driving within Yosemite National Park on July

14  23, 2016, failed to comply with the directions of traffic control devices in violation of 36

15  CFR 4.12 is clear and unrefuted.  Rangers Montoya and McGahey both testified that

16  they independently saw Defendant doing precisely that, driving in a right lane clearly

17  marked in several places as being reserved for busses. Though Defendant filed a written

18  statement (not moved into evidence in his trial) denying same, reported comments from

19  him (to the effect he saw it as a passing lane) and from his passenger (to the effect that

20  others were doing the same thing) support the Rangers' uncontested evidence and a

21  finding of guilt beyond any reasonable doubt.

22      The evidence regarding Defendant's level of intoxication and impairment at the

23  time he was stopped by Ranger Montoya is not without some conflict.

24      Certainly Government witness Matt Thomas, who has had training and

25  experience recognizing intoxication-produced impairment, believed, for the reasons

26  stated in his testimony, summarized above, that Defendant had been drinking and was

27  intoxicated and impaired when he left the Wawona Hotel.  That is some evidence of guilt.

28  Some discrepancies between Mr. Thomas's testimony and his original report and the

known facts (relating, for example, to the color of Defendant's companions' hair, what the group was drinking, the make of Defendant's car, and Defendant's weight) call into question the accuracy of his recollections (although not the credibility of the witness generally). Moreover, the Court observes that other factors—the possible intoxication of Defendant's companions—could have accounted for Defendant's behavior as he walked from the hotel (i.e., the threesome leaning on each other and stumbling as they walked) and one of his companions getting in the driver's seat with him may have explained his backing up awkwardly and hitting his horn.

The Rangers acknowledged that they saw no signs of impaired driving as Defendant passed them and followed instructions to change lanes and then pull over.

However, as noted in the Joint Statement of Testimony, above, Ranger Montoya, observed that at the time of the stop Defendant had sluggish, watery eyes and slurred speech, and he gave inconsistent answers to questions.  McGahey also described slow speech, slurring, and red eyes. Further, based on his qualifying training and experience, Montoya felt that defendant performed less than perfectly on the balance tests and in his ability to multitask and follow directions.

While the Court should and will give deference to these trained observations, deference is tempered by concern that the described failures of performance were quite minor indeed and, like the red eyes, speech, and questionable responses, not clear to one observing the video of the event.  Moreover, some or all of these signs could be attributable in part, if not all, to not-uncommon nervousness in one being subjected to such tests, difficulty hearing a soft spoken ranger over traffic noise, and the peculiar, awkward, and difficult nature of the tests themselves. Mr. Dorrance reported that 40% of sober people are unable to complete such tests correctly.

The HGN evaluation, though widely used and relied upon, is far from foolproof. Montoya observed, and McGahey corroborated, several signs that indicated impairment, and we know that alcohol can cause such signs and impairment.  But, the Government also acknowledged that other conditions can produce similar results. Again, Mr.

46

1    Dorrance opined that while a properly conducted HGN procedure can be enlightening,

2    95% of officers giving them do not conduct the test correctly.  He has seen cases where

3    officers detect six HGN clues on individuals with a breath alcohol level as low as .02%.

4         The above-described evidence, especially when accumulated, certainly indicated

5    impairment by intoxication and gave probable cause for the arrest of Defendant. Does it,

6    alone, prove intoxication at a level prohibited by law?  The Court need not answer that

7    question because the results of the Alcotests and their interpretation satisfy the Court

8    beyond all reasonable doubt of Defendant's guilt.

9         In this latter regard, the first successful evidentiary test gave a BAC reading of

10   0.13%.  The second, 0.14%, both substantially above the 0.08% presumptive level of

11   intoxication established by 36 CFR 4.12.

12        Expert witness Winn testified that the Alcotest machine used in Defendant's case

13   was properly maintained, checked and tested for accuracy and the test was properly

14   administered. Assuming, as she did given the history presented, that well over an hour

15   had elapsed between Defendant's last consumption of food or drink and administration

16   of the  Alcotest, and thus assuming full absorption, Ms. Winn competently opined that

17   Defendants BAC would have been somewhere between 0.15% to 0.17% at the time he

18   was driving.  She opined further that even if Defendant had consumed a beer within 15

19   minutes of the stop, his BAC would have been between 0.12% and 0.14%.  She also

20   testified that the Alcotest test results were consistent with the preliminary breath test at

21   the scene of the stop. (Though the non-evidentiary breath test at the scene was not in

22   evidence, it was available to both sides and their experts and reasonably considered by

23   them in forming and expressing their opinions.)

24        Though challenging some of Ms. Winn's assumptions, particularly her conclusions

25   on time for full absorption of alcohol, Defendant's expert witness Dorrance did not offer a

26   contrary opinion about Defendant's BAC at the time of driving.

27        The Court finds that Defendant was driving his vehicle while intoxicated with a

28   BAC of greater than 0.08%. This is established beyond a reasonable doubt by the

1   evidence of the results of field sobriety testing and HGN testing and, of course, the

2   results of the Alcotests and Ms. Winn's extrapolation therefrom.  It is conceivable, as Mr.

3   Dorrance testified, that Defendant had unabsorbed alcohol in his system at the time of

4   arrest and thus that his BAC was rising and so higher at the time of the Alcotests than

5   when he had been driving.  Conceivable does not reach the level of reasonable in light

6   of all the evidence of intoxication in this case.

7       That same evidence compels a finding that Defendant was so intoxicated as to

8   have been incapable of safe operation within the meaning of 36 CFR Section 423 (a) (1).

9   The totality of evidence in a case such as this can establish that a defendant was

10  intoxicated to a degree that rendered him incapable of safe operation. See United States

11  v. Coleman, 750 F. Supp. 191, 196 (W.D. Va. 1990); see also United States v.

12  McFarland, 369 F. Supp. 2d 54, 60 (D. Me. 2005), aff'd 445 F.3d 29 (1st Cir. 2006). This

13  evidence can include the defendant's blood alcohol content, the officer's observations in

14  the field, and defendant's performance on the field sobriety tests. See United States v.

15  French, No. 2:08mj726, 2010 WL 1633456, at *4 (D. Nev. Apr. 22, 2010) ("The results of

16  the field sobriety tests, combined with the officer's other observations may provide

17  probable cause to arrest and may be sufficient to support a conviction for driving under

18  the influence of alcohol in violation of 36 C.F.R. § 4.23(a)(1)."), aff'd No. 2:10-cv-1072,

19  2011 WL 90083 (D. Nev. Jan. 10, 2011); Coleman, 750 F. Supp. at 196 (results of blood

20  alcohol test can be considered as one piece of evidence in the analysis under §

21  4.23(a)(1)).

22      In the instant case, that totality of the evidence includes the presumption created

23  by Defendant's BAC of .12 or higher when driving as calculated by Ms. Winn. It includes

24  Ms. Winn's trained opinion that anyone with a BA greater than 0.06 is "impaired".  It

25  includes Defendant's shortcomings on field sobriety tests.  It includes Defendant's

26  disregard of the traffic control/lane restriction signs.  It includes Defendant immediate

27  reversion to a disregard of those signs even after having been warned by Ranger

28  McGahey about compliance.  Finally, and not insignificantly, the totality of the evidence

includes Defendant's particularly unsafe driving practices – driving with a passenger in the driver seat with him – on leaving the Wawona Hotel parking lot.  Given this evidence, the Court finds beyond a reasonable doubt that Defendant also violated  36 CFR Section 423 (a) (1).

**V.      Findings and Conclusions**

For the reasons set forth above, the Court

1.   OVERRULES DEFENDANT'S OBJECTIONS to Ranger Montoya's testimony regarding HGN testing of Defendant and Ranger Montoya's  interpretation of the results of such testing;

2.  OVERRULES DEFENDANT'S OBJECTIONS to admission into evidence of the results of Acotest testing to determine Defendant's blood alcohol concentration ; and

3.   FINDS DEFENDANT **GUILTY** beyond a reasonable doubt of:

   a. Violating Title 36 Code of Federal Regulations Section 4.23(a)(2) by operating a vehicle with a blood alcohol concentration of .08 grams per 210 liters of breath;

   b. Violating Title 36 Code of Federal Regulations Section 4.23(a)(1) by driving under the influence of alcohol to a degree that rendered him incapable of safe operation; and,

   c. Violating Title 36 Code of Federal Regulations Section 4.12 by failing to comply with the directions of traffic control devices,

all as charged in the Criminal Complaint against him on file herein.

Defendant is hereby ORDERED to appear for sentencing in this, the Yosemite Court, at 10:00 AM, Tuesday, June 19, 2018.
IT IS SO ORDERED.


Dated:   __April 16, 2018__          /s/ *Michael J. Seng*

                                    UNITED STATES MAGISTRATE JUDGE

49